**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 26-23-18** |
| **DYQUAVION SHORT**<br>**a/k/a "Jah"** | : | |
| | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Dyquavion Short, a/k/a "Jah," was one of numerous basketball players charged and adjudged guilty in a far-reaching bribery, fraud, and point-shaving scheme. The defendant fixed games while playing for the University of New Orleans ("New Orleans"). The scheme corrupted the integrity of National Collegiate Athletic Association ("NCAA") Division I men's basketball and caused substantial losses to victims of the scheme.

The scope of the scheme was extraordinary. The scheme involved more than 39 players on more than 17 different NCAA basketball teams who fixed and attempted to fix more than 29 games. The scheme resulted in more than $3 million in fraudulent wagers placed on these games, and more than $1.1 million in financial losses to sportsbooks throughout the country. But the harm extends well beyond the dollars lost. The leaders of this scheme, along with the players they recruited, corrupted the fundamental principles on which competitive sports depend—fairness, honesty, and respect for the rules of competition—and they did so because of greed.

The corrupt players in this case, like Short, dedicated their lives to competitive sports, reached the pinnacle of college basketball, earning NCAA Division I scholarships, and were among the top college basketball players in the country. Given their status as scholarship student-athletes, they occupied a position of prominence and trust within their universities, and

their teammates, coaches, and fans relied on them to compete honestly. Instead, the corrupt players betrayed that trust and compromised the integrity of the competition for personal financial gain, choosing to accept bribe payments to fix games. Their criminal conduct ran contrary to everything they had been taught about fair competition and sports. They harmed the NCAA, the schools and athletic programs they represented, as well as their fellow players and coaches who played by the rules, and the fans who looked up to them. These corrupt players knowingly agreed to abuse the very position and opportunities they had worked to attain by underperforming in games for money. Such conduct calls for criminal punishment.

At the same time, Short has accepted responsibility for his conduct, has shown remorse, and has done so in a timely manner. Because there was less illegal betting on the games he fixed than the games fixed by many other defendant-players in this case, Short faces a guideline sentence of 0 to 6 months. This range is at the lowest end of the applicable guidelines for the corrupt players charged in this case, placing Short at the lower end of culpability among the defendant-players. Considering all these facts and for the reasons set forth below, this Court should impose a sentence within the applicable guideline range of 0 to 6 months.

## I. SUMMARY OF CRIMINAL CONDUCT

### A. The Bribery, Fraud, and Point-Shaving Scheme Generally

Beginning in or about September 2022, a group of individuals worked together to recruit and bribe players to help influence or "fix" Chinese Basketball Association ("CBA") games through "point shaving" during the 2022-2023 season. The fixers bribed CBA players to fix games and then, through various gambling outlets, placed large wagers on those games against

the teams whose players they had bribed. The fixers involved in this CBA aspect of the scheme included Antonio Blakeney, Marves Fairley, and Shane Hennen.

After profiting on the fixed CBA games, the fixers turned their attention to NCAA men's basketball games. During the 2023-2024 and 2024-2025 NCAA men's basketball seasons, the fixers agreed to recruit NCAA players who would accept bribe payments in exchange for helping to influence outcomes of NCAA basketball games. In particular, the fixers agreed to recruit into the scheme players who would help ensure that their team failed to cover the spread of the first half of a game or an entire game. The fixers would then place wagers on those games through the gambling outlets, betting against the team whose player or players they had bribed to engage in this point-shaving scheme.[1] Because of the proliferation of legalized sports betting, the fixers could use numerous gambling outlets to make their bets on these games and conceal the scheme from authorities. The fixers also expanded the group of individuals involved in leading the scheme, fixing games, and recruiting players to participate in the scheme. Those additions included, among others, Jalen Smith, Roderick Winkler, and Alberto Laureano.

Five of the fixers, Jalen Smith, Antonio Blakeney, Marves Fairley, Roderick Winkler, and Alberto Laureano, then approached and communicated with NCAA basketball players, in person and through social media and cellular telephone calls. In these communications, the fixers offered the players bribe payments, usually ranging from $10,000 to $30,000 per game, to participate in the scheme. The fixers also attempted to recruit multiple players from a team to

[1] Obtaining complete information on bets placed by individuals is impossible. There are numerous betting outlets in the United States and elsewhere, legal and illegal, and numerous ways to make bets that cannot be traced. The government has identified in this memorandum and seeks to hold the defendant responsible (as set forth in the stipulations in the plea agreement) only for the bets that it could find that were attributable to the scheme.

join the bribery scheme and further ensure its success. Many of these players accepted the offers and agreed to help fix specific games so that the fixers would win their wagers. The fixers targeted for their scheme NCAA basketball players for whom the bribe payments would meaningfully supplement or exceed legitimate NIL opportunities.

Smith, Blakeney, Fairley, Winkler, and Laureano had credibility with many of the players and could approach them to engage in this scheme because of their prominence, experience, and reputation in local and national basketball communities. Smith was a resident of North Carolina who was active in the training and development of basketball players for professional scouting combines. Blakeney was a resident of Florida and a former McDonald's All-American and college basketball player who also played professional basketball in the National Basketball Association ("NBA") and overseas and who had himself accepted bribes from his co-schemers to underperform in CBA games. Fairley was a resident of Mississippi and a high-stakes sports gambler, social media influencer, and sports handicapper who sold betting advice to others. Winkler was a resident of Arkansas and a former coach and trainer for high school and Amateur Athletic Union ("AAU") basketball teams and players. Laureano was a resident of New York and a former college basketball player.

As the fixers had agreed, Smith, Blakeney, Fairley, Winkler, and Laureano then communicated with the NCAA basketball players who had agreed to participate in the bribery scheme and directed them to underperform or otherwise help influence the outcome of particular games or a specific portion (generally the first half) of particular games.

Smith, Blakeney, Fairley, Winkler, Laureano, and Shane Hennen, a resident of Philadelphia and Nevada and a high-stakes sports gambler, as well as other co-schemers, then

placed bets with numerous gambling outlets on NCAA men's basketball games involving the bribed NCAA players. They placed these bets in a manner that was consistent with the way in which they had arranged to fix the outcome of a game, or a portion of a game, to maximize their chances of winning their wagers. The bribed NCAA players then influenced, attempted to influence, and conspired to influence the outcome of their games through intentionally poor performances, removing themselves from games, supporting their teammates who were also involved in the scheme, and through other means.

At times, while Hennen was in the Eastern District of Pennsylvania, the other fixers communicated and strategized about the scheme with Hennen, and Hennen placed bets on the fixed games with online gambling outlets and in person at casinos. At least one of those fixed games occurred in the Eastern District of Pennsylvania. In addition, individual bettors unaware of the scheme placed bets on the fixed games, often on the other side of the fixers' bets, in the Eastern District of Pennsylvania, resulting in losses to the individual bettors.

When the fixers were successful with their wagers on fixed games, Smith and other co-schemers traveled to NCAA school campuses and made cash bribe payments to the players who had agreed to participate in the scheme. On at least one occasion, Smith traveled to the Eastern District of Pennsylvania through the Philadelphia International Airport to pay one of the bribed players.

### B. Short's Involvement in the Bribery and Point-Shaving Scheme

The defendant, Dyquavion Short, participated in this scheme as a player on the University of New Orleans Privateers Men's Basketball Team ("New Orleans"). Specifically, in or about late December 2024, the fixers, including Smith and Fairley, recruited for their point-

shaving scheme New Orleans players Short and Cedquavious Hunter. The fixers also attempted to recruit other New Orleans players for the scheme, including Person #18 and Person #19 (as identified in the indictment). In FaceTime communications with the fixers, Short and Hunter agreed to underperform in and influence upcoming New Orleans games in exchange for bribe payments.

As part of the point-shaving scheme, at the direction of the fixers, Short and Hunter underperformed in and influenced at least three New Orleans basketball games, ensuring that New Orleans did not cover the spread in those games. Short intentionally underperformed in those games by, among other ways, playing with less than 100% effort, not playing aggressively, not diving on loose balls, and not contesting shots on defense, allowing the opponents to score. Smith and Fairley, and others working at their direction, placed bets on New Orleans' opponents in each of the games to cover the full-game spread. Those bets were successful. Accordingly, Smith and Fairley, and other fixers arranged for the delivery of, and delivered thousands of dollars in bribe payments to Short and Hunter and the other players. Three of the fixed New Orleans games, for example, that were part of this scheme are as follows:

On December 28, 2024, New Orleans played against the McNeese State University Cowboys Men's Basketball Team ("McNeese State"). McNeese State was favored by approximately 23 points for the full game. McNeese State won the game 86 to 61, covering the spread of approximately 23 points, and the fixers won their bets.

On December 30, 2024, New Orleans played against the Vanderbilt University Commodores Men's Basketball Team ("Vanderbilt"). Vanderbilt was favored by approximately

33 points for the full game. Vanderbilt won the game 100 to 56, covering the spread of approximately 33 points, and the fixers won their bets.

On January 11, 2025, New Orleans played against the Southeastern Louisiana University Lions Men's Basketball Team ("Southeastern Louisiana"). Southeastern Louisiana was favored by approximately 6.5 points for the full game. Southeastern Louisiana won the game 91 to 71, covering the spread of approximately 6.5 points, and the fixers won their bets.

After the fixers' bets against New Orleans in these games were successful, Smith arranged through text messages with Short and Hunter and the other New Orleans players, to pay the players for their participation in the scheme. Smith then had an individual working for him deliver thousands of dollars in cash payments to the players.

On September 3, 2025, in a voluntary interview on the record with agents from the Federal Bureau of Investigation, Short stated that he participated in the scheme as summarized above. In particular, Short said that he underperformed in games in exchange for bribes by not playing his hardest and just "going through the motions." Short said that Smith texted him to arrange the payments for fixing the games and that an unknown white male with a hood and ski mask paid them multiple times. The bets known to the government made by the fixers on the New Orleans games involved in this scheme resulted in approximately $33,741 in winnings for the fixers.

## II. LEGAL STANDARD

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[2]

At the second step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent § 3553(a) factors in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the § 3553(a) factors.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

The Court may impose the following statutory maximum sentence: For Count One, charging bribery in sporting contests, a term of imprisonment of 5 years, a term of supervised release of 3 years, a fine of $250,000, and a special assessment of $100. Full restitution also shall be ordered. Forfeiture of all proceeds from these offenses also may be ordered.

---

[2] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

**B. Sentencing Guidelines**

The government agrees with the following sentencing guideline calculation as set forth in paragraphs 66 through 74 of the Draft Presentence Investigation Report dated October 27, 2026 ("PSI"):

Under USSG § 2B4.1, the base offense level for a violation of 18 U.S.C. § 224 (bribery in sporting contests) is 8. Under USSG §§ 2B4.1(b)(1) and 2B1.1(b)(1)(C), because the value of the improper benefit to be conferred from the bribes was more than $20,000 but less than $55,000, the offense level is increased by 4 levels. Under USSG § 3E1.1(a), the defendant accepted responsibility for his offense, resulting in a 2-level decrease to the offense level. Under USSG § 4C1.1, the defendant is a zero-point offender, resulting in a 2-level decrease to the offense level.

This results in a total offense level of 8. The defendant is in Criminal History Category I, yielding a sentencing guideline range of zero to six months. PSI ¶ 110. Because the defendant qualifies for a zero-point offender adjustment under USSG § 4C1.1, and the defendant's applicable guideline range is in Zone A of the Sentencing Table, "a sentence of imprisonment is not required" and a sentence other than a sentence of imprisonment is considered "generally appropriate" under USSG § 5C1.1(b) and USSG § 5C1.1, comment (n.9). PSI ¶ 111.

**IV. GOVERNMENT'S SENTENCING RECOMMENDATION**

**A. Sentencing Factors**

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a guideline sentence is appropriate in this case. The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

"These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range.'" *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (*quoting Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences. *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, the Court must also consider all the sentencing considerations set forth in § 3553(a).

**B. Application**

The relevant § 3553(a) factors will be discussed in turn.

**(1) The nature and circumstances of the offense**

The nature and circumstances of Short's criminal conduct are serious. As discussed throughout this memorandum, Short accepted bribes and joined with multiple teammates to fix multiple college basketball games. In doing so, Short participated in a bribery scheme that involved millions of dollars in betting and resulted in at least $1.1 million in losses to the financial victims of the scheme.

The corruption and fraud involved in this case did tremendous damage to the integrity of NCAA basketball. Officials from the NCAA provided a written statement signed by Jonathan Duncan, the NCAA's Vice President of Enforcement, addressing the broad impact that this conduct had on college sports—considering the perspectives of the different categories of people involved in college sports, such as the schools, the student athletes, the coaches, and the fans.

The statement explains in detail how this conduct undermined the integrity of sports; degraded the efforts of student athletes who have spent their lives dedicated to their sport; and betrayed the trust of fans who believe the games they watch are decided on the court and not in FaceTime communications where bribery schemes are hatched. For example, Mr. Duncan explained:

> Impacting outcomes of college basketball games causes harm far beyond any single game, bet or financial transaction. When individuals intentionally influence the outcome of a sporting contest for gambling purposes, they undermine the integrity of competition. Student-athletes dedicate countless hours to training, preparation and competition with the expectation that contests will be conducted fairly. Contest manipulation devalues those efforts and unfairly disadvantages every participant who competes within the rules. Authentic competition is central to the student-athlete experience, and competition manipulation undermines the earnest efforts of teammates, coaches, opponents, schools and conferences. These are competitions young people have been preparing most of their lives for and may well be their last athletics opportunity at such a level.
>
> Fans must have confidence that the performances they spend money to attend or watch are conducted fairly and the outcomes are based only on ability. Those ticket and broadcast revenues enable NCAA schools to provide hundreds of thousands of college athletes tremendous benefits, including $4 billion in scholarships, as well as health and wellness support and countless hours of coaching, training, mentoring and development. Should fans question the integrity of the game, this entire system that provides unprecedented benefits to student-athletes is at risk.
>
> …
>
> Perhaps most importantly, conduct involving contest manipulation, such as the conduct involving bribery and game fixing as charged in this case, strikes at public confidence in sport. Fans, media partners, sponsors and the public engage with college sports because they believe competitions are fair, genuine and unscripted. If that confidence is lost, the damage extends beyond a single school or sporting event. The credibility of the broader college athletics system is called into question. The resulting reputational harm can have lasting detrimental effects on all student-athletes and schools, the public's trust in the game, and the college sports ecosystem as a whole.

This was obviously a serious crime involving corruption and fraud that had a substantial impact on the "college sports ecosystem as a whole," calling for appropriate punishment within the

applicable guidelines, which are relatively low given the lack of known betting on the games Short helped fix.

**(2) The history and characteristics of the defendant**

The defendant's history and characteristics do not explain his criminal conduct in this case. He does not have a criminal record. According to the defendant, he had a good upbringing, as he was raised by both parents in family-oriented neighborhood of Greenville, South Carolina. His parents provided well for him and helped him rise to the level of a Division I athlete. He did not experience any mistreatment or abuse. The defendant has no history of drug or alcohol abuse and no history of mental health issues. By all accounts, the defendant should have made better choices than to engage in this scheme and to do so with multiple basketball games. His decision to accept bribe payments and fix games for personal financial gain, at the expense of both his own integrity and the integrity of those games, demonstrates a profound lapse in judgment that is wholly inexplicable in light of his history and characteristics.

On the other hand, the defendant did admit to his misconduct and agreed to plead guilty early in the process. He has shown remorse. A sentence within guideline range is appropriate for this defendant, considering his history and characteristics.

**(3) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4) The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

There is a strong need to impose a sentence that reflects the seriousness of these offenses, promotes respect for the law, and provides just punishment. The defendant's conduct, like that of other players, was limited to the games he helped fix. The applicable guidelines reflect his level

of involvement in the scheme as well the good fortune for this defendant that the fixers (having nothing to do with the defendant's conduct) made fewer known bets on the games Short fixed than they did on other games in this scheme. There are many other corrupt players in this case who will face appropriately higher guideline ranges resulting from more typical betting on the fixed games. By sentencing this and other defendants to sentences within the guidelines (after considering all the sentencing factors), this Court should appropriately punish each defendant for their roles in the scheme. Such sentences, as the one recommended here, will promote respect for the law and deter others from engaging in this type of activity. The justice system must appropriately punish corruption and fraud, especially when the crimes impact institutions that are important to the public. Crimes like this are difficult to detect, as evidenced by the length of time that the defendants engaged in the crimes here, making it even more essential that the sentence deter those who might engage in this type of criminal activity. A guideline sentence here will accomplish those objectives.

**(5) The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to fashion a sentence that would provide the defendant with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully

considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The recommended guideline sentence fairly considers this defendant's conduct and the circumstances of his case, and there is no basis to conclude that a sentence within the applicable guidelines range would result in any unwarranted disparities.

**(7) <u>The need to provide restitution to any victims of the offense.</u>**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. The government is seeking forfeiture and a fine from this defendant, and he will have the opportunity to earn money to make these payments if the Court imposes a sentence within the guideline range.[3]

## V. CONCLUSION

For all of the reasons set forth above, and subject to any additional information presented at the hearing and in the Sealed Supplement, the government respectfully requests that the Court impose a sentence within the guidelines range of 0 to 6 months. The government also requests that this Court order forfeiture of $15,000 as set forth in the government's motion for a

[3] Restitution is not mandatory for the sports bribery offense to which the defendant pleaded guilty. Although the Court has discretion to order restitution, the government does not recommend that restitution be imposed on the defendant-players, including Short, because allocating victim losses to individual players would involve significant complexity and risk inequitable results. As discussed above, the defendants' conduct caused losses to numerous victims, including sportsbooks and casinos. When calculating losses to casinos from the entire scheme, the government has already offset those losses by the amounts casinos gained from the fixers' failed bets. The defendant-fixers who pleaded guilty to wire fraud are jointly and severally liable for those net losses. Attempting to calculate restitution separately for individual defendant-players, each of whom participated in only a subset of fixed games, could produce inconsistent and anomalous financial penalties among the players and, in some instances, result in victim-casinos receiving more than their actual losses.

preliminary order of forfeiture and impose a fine within the guideline range of $2,000 to $20,000.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Louis D. Lappen*
LOUIS D. LAPPEN
JEROME M. MAIATICO
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed on ECF and served via email upon:

Leigh Skipper
Duane Morris
30 South 17th Street
Philadelphia, PA 19103
lmskipper@duanemorris.com

*/s/ Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

Date: November 5, 2026